UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANDRE NICHOLS and DANIEL MORAES,

     Plaintiffs,

 - against -          08-CV-3306 (CM)(DCF)

MICHAEL T. MAHONEY, EMC CONTRACTING
INC., EMC NEW YORK CONTRACTING, and
EMC of NEW YORK, INC.

     Defendants.

## AFFIRMATION OF GEORGE L. SANTANGELO, ESQ. IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

GEORGE L. SANTANGELO declares under penalty of perjury:

1.  I am a member of the bar of this Court, and I am counsel to defendants Michael T. Mahoney, EMC Contracting, Inc., EMC New York Contracting and EMC of New York, Inc. I submit this affirmation in support of Defendants' motions to pursuant to Fed. R. Civ. Pro. 12(b)(1) and 12(b)(6) dismissing the complaint for failure to state a cause of action and absence of subject matter jurisdiction and pursuant to the Court's inherent and equitable powers for such other and further relief as this Court may deem just and proper.

2.  The motions to dismiss are directed to the face of the pleadings on file with the Court, specifically the complaint and the RICO Case Statement dated May 30, 2008.  The grounds for dismissal are set forth in the accompanying Memorandum of Law.

WHEREFORE, your affirmant respectfully requests that Defendants' motion to dismiss and for such other and further relief as this Court may deem just and proper be granted in all respects.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:          New York, New York
                July 2, 2008

                                                    _____
                                                    GEORGE L. SANTANGELO

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANDRE NICHOLS and DANIEL MORAES,

                              Plaintiffs,

        - against -                                          08-CV-3306 (CM)(DCF)

MICHAEL T. MAHONEY, EMC CONTRACTING
INC., EMC NEW YORK CONTRACTING, and
EMC of NEW YORK, INC.

                              Defendants.

---

## MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## INTRODUCTION

      Defendants Michael T. Mahoney, EMC Contracting, Inc., EMC New York Contracting

and EMC of New York, Inc. (hereafter, "Defendants") respectfully submit this Memorandum of

Law together with the accompanying affirmation of George L. Santangelo, Esq. in support of

Defendants' motions pursuant to Fed. R. Civ. Pro. 12(b)(1) and 12(b)(6) dismissing the

complaint for failure to state a cause of action and absence of subject matter jurisdiction and

pursuant to the Court's inherent and equitable powers for such other and further relief as this

Court may deem just and proper.  This is a case where Plaintiffs seek to advance a number of

theories why, as former employees, they should recover because they claim the Defendants hired

undocumented aliens over the years Plaintiffs were employed.   As set forth below, Plaintiffs

advance claims under RICO, antitrust and labor laws, that are invalid, improperly plead and

betray Plaintiffs lack of standing.   All counts must be dismissed.

## THE COMPLAINT

The Complaint alleges that EMC Contracting, EMC New York Contracting, and EMC of New York are all names for the same business with locations in New York, New Jersey and Connecticut, and with defendant Michael Mahoney as president.  Plaintiff Nichols worked for EMC from October 2004 to November 2006.  ¶30.  Plaintiff Moraes worked for defendants "in 2007."  ¶31. The plaintiffs claim they "are the victims of a scheme perpetrated by defendants to depress the wages paid to its employees, including plaintiffs, by knowingly hiring a workforce substantially comprised of illegal workers, in violation of Section 274 of the Immigration and Nationality Act, for the express purpose of depressing the wages of all of its workers." Complaint, ¶ 1.  The complaint further contends that the illegal scheme "also restrains free competition within the construction industry by allowing defendants to have an unfair advantage over other employers who do not employ illegal workers and forces workers authorized to work in the U.S. to unfairly compete against illegal workers for jobs at much lower wages." Complaint ¶ 2.

**Count I.  RICO, 18 U.S.C. § 1962(c).**  The Complaint contains two RICO claims that are both based upon alleged predicate violations of (1) the Immigration and Nationality Act and (2) the federal mail and wire fraud statutes.

*Immigration Predicates.*    Plaintiffs allege "illegal alien hiring" in violation of Section 274(a)(3)(A) of the Immigration and Nationality Act.  Ignoring the requirement that defendants have knowledge that aliens were brought into the country for the purpose of illegal employment, plaintiffs simply allege that defendants "knowingly hire[d] for employment at least 10 individuals with actual knowledge that the individuals are aliens…"  ¶ 47 (quoting statute). Plaintiffs contend that since 2002 when EMC started its construction business in New York City, defendants "have employed dozens of hourly paid workers in its operations in New York City"

2

and that defendants "have employed and continue to employ workers that they knew or had

reason to know were not authorized to work in the U.S." ¶ 20, and that they "routinely fail to

ask employees for proof of employment eligibility." ¶21   Again "on information and belief" the

Plaintiffs continue that job sites were shut down for fear of "Immigration and Naturalization

Service" raids and advised of an attorney who could help obtain legal work papers. ¶¶22-23.

Plaintiffs also assert on information and belief that Defendants had a relationship with American

Latin Services Enterprises, Corp. who "provides a pool of illegal workers" who take direction

from EMC but are paid by American Latin and that Defendants "knew or had reason to know"

the American Latin workers were not authorized to work.

Based on these allegations, Plaintiffs assert more broadly that Defendants acted with "the

express purpose to drive down the wages of its workers" and thereby reduce costs to increase

profits.  ¶24.  Plaintiffs claim their wages were "lower than the market rate" and that this was

"the direct and proximate result" of hiring undocumented aliens.  ¶¶32-33.  Plaintiffs alleged this

also reduced bargaining power of the workers.  ¶35.

*Mail and Wire Fraud Predicates.*  Plaintiffs also allege that defendants violated the mail

and wire fraud statutes, 18 U.S.C. § 1341,1343.  ¶¶36-46.  Plaintiffs claim that the I-9 form is the

form employers must complete to verify employment eligibility. ¶39.  Plaintiffs state on

information and belief that "defendants and American Latin knowingly engaged in a scheme in

which they knowingly falsely attested to having complied with the I-9 requirements."  ¶40.

Plaintiffs contend defendants and American Latin "used the U.S. mail to further the fraudulent

scheme" and that "each and every mailing of an I-9 from to the INS for the purpose of

facilitating the hiring of an illegal alien violates the mail fraud statute."  ¶¶43-44.

With respect to wire fraud, Plaintiffs simply state upon information and belief that "defendants also made repeated use of the interstate wires to transfer and move monies and/or documents in further of the Illegal Alien Hiring Scheme" and that each such use "in furtherance of defendants' illegal scheme to defraud their workers violates the wire fraud statute." ¶44,46.

*RICO Allegations.* With respect to Count I, Plaintiffs charge that defendants operated the enterprise "EMC" through a pattern of racketeering activity of immigration violations and mail and wire fraud. Specific defendants are not identified as to this count. Plaintiffs contend the pattern of racketeering was "open ended" and "poses a threat of continued long-term future criminal conduct." ¶¶51-54. They contend that by reason of defendant's RICO violations, they were paid depressed wages as a direct result. ¶¶ 89-95

**Count II. RICO, 18 U.S.C. § 1962(c).** Count II repeats the allegations as to Count I, but identifies Mahoney, EMC and American Latin as an "association in fact" enterprise under 18 U.S.C. § 1961(4). ¶99. They contend that the "enterprise had defined roles, and the enterprise as a whole had an ongoing existence, structure, and hierarchy." ¶100.

**Count III. RICO Conspiracy, 18 U.S.C. § 1962(d).** Plaintiffs repeat their RICO allegations and add that defendants conspired with American Latin to violate RICO with respect to both alleged enterprises.

**Count IV. Sherman Act, 15 U.S.C. § 1.** Defendants also allege "anti trust violations." ¶¶ 74-80. Plaintiffs assert that in the "very specialized area of carpentry work in the construction industry" jobs are typically awarded by bid. ¶¶75-76. Plaintiffs claim that by hiring undocumented workers, Defendants are able to pay workers a lower wage and underbid the competition and inflate the pool of workers allowing employers to hire "not based on skill but on

acceptance of lower wages." This, according to Plaintiffs, has "unreasonably restrained trade" and affected interstate commerce. ¶¶ 79-80.

According to Plaintiffs, the above activity "unreasonably restrains trade and/or commerce in violation of 15 U.S.C. § 1" and further that "Plaintiffs injuries are the type that the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." ¶¶110,117.

**Count V. Donnelly Act, N.Y. Gen Bus. Law. § 340.** Plaintiffs reassert their antitrust allegations under the Donnelly Act which prohibits "Every contract, agreement, arrangement or combination whereby…Competition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state is or may be restrained." ¶120.

**Count VI. FLSA, 29 U.S.C. § 201.** Plaintiffs allege that defendants "failed to pay overtime wages" and that "[f]or those weeks in which plaintiffs' paychecks bounced for insufficient funds, defendants failed to pay the minimum wage…." ¶¶122-23.

**Count VII. New York Labor Law § 190.** Plaintiffs repeat their allegations as to failure to pay minimum wage when checks bounced or overtime.

## ARGUMENT

### I.    The RICO Claims Fail to State a Claim Because the Predicates Are Invalid.

Counts I, II and III are invalid because the RICO predicates said to form the pattern of racketeering activity are invalid.

#### A.    The INA Predicates Do Not Fall Under RICO

Plaintiffs' Immigration and Nationality Act ("INA") claims do not fall under the RICO statute. Plaintiffs miscomprehend the requirements of the RICO statute and the relevant statute

under the INA to which they cite.   It is not a RICO predicate for an employer to simply

knowingly hire undocumented aliens.  More is required that Plaintiffs do not (and cannot) allege,

to wit, that that the defendants knew that the undocumented aliens they allegedly hired were

brought into the country for the purpose of illegal employment.

RICO in its definition of "racketeering activity" includes among the list of predicate acts

"any act which is indictable under the Immigration and Nationality Act, section 274 *(relating to*

*bringing in and harboring certain aliens)* 18 U.S.C. § 1961(1)(emphasis added).  It is central to

the issue here to understand that Section 274 does not contain any criminal sanction for merely

hiring undocumented aliens.  The provision cited by Plaintiffs is cropped in their complaint to

read as if it merely prohibits defendants from "knowingly hir[ing] for employment at least 10

individuals with actual knowledge that the individuals are aliens…"  ¶ 47 (quoting statute).

What Plaintiffs omit is that the "alien" in question must be one "described in subparagraph (B),

which in turn defines "alien" to refer to someone who "(i) is an unauthorized alien … , and (ii)

*has been brought into the United States in violation of this subsection.* 8 U.S.C. § 1324(a)(3)(B)

(emphasis added).  Thus, under this provision, the defendant must know that the individuals

being hired were unauthorized aliens who were brought into the country in violation of the

prohibition on their entry and employment.

As explained in the leading decision of *System Management, Inc. v. Loiselle,* 91

F.Supp.2d 401, 408-09 (D.Mass. 2000), *rev'd on other grounds,* 303 F.3d 100 (1st Cir.2002), the

provision in question requires:

> in order for liability to attach, that the aliens have been brought into
> the country by an employer for the purpose of illegal employment.
> Thus, to state a civil RICO claim on the basis of a violation of this
> subsection of Title 8, the Plaintiffs must allege that Loiselle had
> knowledge of how the aliens had been brought into the United States
> and that they were *brought* into the United States in violation of this

> employment provision. Although the Plaintiffs have alleged that
> Loiselle had knowledge of the aliens' illegal status, they have not set
> forth any factual allegation as to how the aliens entered the country or
> whether Loiselle had any knowledge of the purpose for which they
> entered. The text of 8 U.S.C. § 1324(a)(3) therefore compels the
> conclusion that the RICO claim brought on the ground of
> employment of aliens must be dismissed.

*Id.* (emphasis in original).  *See also Hernandez v. Balakian*, 480 F.Supp.2d 1198, 1204-05

(E.D.Cal. 2007)(agreeing with *Loiselle* that plaintiff must show more than employer knowledge

of unauthorized status but also knowledge that unauthorized workers brought into country in

violation of subsection).

Indeed, it is most noteworthy that Section 274A of the Immigration and Nationality Act,

which Congress did *not* include among the RICO predicates is titled,  "Unlawful employment of

aliens" and broadly penalizes simple employment of illegal aliens in the United States. *See* 8

U.S.C. § 1324a. Section 274A  provides that it is unlawful for a person or other entity "to hire, or

to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an

unauthorized alien ... with respect to such employment." 8 U.S.C. § 1324a(a)(1)(A).  Congress'

conscious decision *not* to include Section 274A among the offenses that can form a pattern of

racketeering underscores that more than simple hiring of undocumented aliens is required for a

RICO action to lie.

**B.**      **The Mail and Wire Fraud Predicates Are Also Invalid.**

**1.**      **Failure to state a claim under the federal fraud statutes**

The mail and wire fraud predicates fail the most basic test of alleging mail or wire fraud.

A case of mail or wire fraud requires proof of (i) a scheme to defraud; (ii) to obtain money or

property; (iii) furthered by use of the mails or wires.  *United States v. Autitori*, 212 F.3d 105, 115

(2d Cir. 2000). Although the scheme need not need be successful in causing actual economic

loss, property loss must be intended by the defendant. <u>Id.</u>; *McNally v. United States*, 483 U.S.

350, 358 (1987).[1] The falsehood underlying the scheme to defraud must be "material," that is, it

"must be of some independent value or must bear on the ultimate value of the transaction." *United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994).

Here, Plaintiffs allege that Defendants committed mail fraud by virtue of their submission of I-9 forms to the INS that falsely certified the requisite certification of work authorization. But in no way shape or form does this plead a scheme to deprive a victim of money or property. The Plaintiffs do not contend, nor could they, that the I-9's result in some gain of money or property from the INS as a result of their submission. This is no scheme to obtain money or property but at most a violation of the law. That Defendants may be perceived as benefiting in some way from the alleged violations does not render this a scheme to obtain money or property, for if it did, RICO would be the endless source of civil litigation for anyone willing to accuse another of making false statements to the government. In this regard it is noteworthy that 18 U.S.C. § 1001, the general false statement statute is *not* among the RICO predicates that Congress has recognized.

The very issue presented here was decided in an opinion by the Eastern District of Washington in *Mendoza v. Zirkle Fruit Co.*, 2000 WL 33225470 (E.D. Wash. 2000), *rev'd on other grounds,* 301 F.3d 1163 (9th Cir. 2002). There the district court rejected an identical contention that false I-9's submitted to the INS could constitute mail fraud to be alleged in a civil RICO brought by workers claiming to be aggrieved by the hiring of undocumented aliens. The court held that the mail fraud statute "prohibits the use of the mails to obtain money or property from the one who is deceived." *Id.* *5 (citing *United States v. Lew*, 875 F.2d 219, 221 (9th Cir.1989) where immigration attorney's conviction for mail fraud overturned because though the attorney sent fraudulent work papers to the Department of Labor on behalf of his illegal alien clients, the Department of Labor was not the source of the financial gain). On appeal the Ninth

10

Circuit reversed on other grounds but noted that the rejection of the I-9 mail fraud theory by the district court was not even appealed by the plaintiffs.   *See* 301 F.3d at 1167 n.2.

## 2.     <u>Failure to comply with Rule 9(b)</u>

Rule 9(b) of the Federal Rules of Civil Procedure requires "the identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations."   The Second Circuit requires in the case of RICO fraud charges that such allegations "state the contents of the communications, who was involved, where and when they took place, and explain why they were fraudulent." *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1176 (2d Cir.1993).   Here, Plaintiffs have done nothing but suggest vaguely that I-9's were sent to the INS.   They do not identify a single I-9 that they contend is false, nor who sent it to the INS.   In fact, Plaintiffs apparently do not even know whether Defendants or non-party American Latin would have made such filings. *See* Complaint ¶40.   The remainder of Plaintiffs' allegations are even more egregious violations of Rule 9(b).   With respect to wire fraud, Plaintiffs simply state upon information and belief that "defendants also made repeated use of the interstate wires to transfer and move monies and/or documents in further of the Illegal Alien Hiring Scheme"   Plaintiffs also vaguely hint at the possibility of other mailings without even attempting to explain what they are talking about.   ¶ 37 ("various documents").   Such allegations do not remotely identify any fraud with particularity.

## II.     <u>The RICO Claims Fail For Other Reasons as Well.</u>

### A.     <u>Absence of Proximate Causation and Standing.</u>

In *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 112 S.Ct. 1311 (1992), the Supreme Court held that the "by reason of" language in section 1964(c) requires a showing by the plaintiff that his or her injuries are proximately caused by the defendant's actionable

conduct. *Id.* at 268.   The crucial question is whether there is a direct connection "between the injury asserted and the injurious conduct alleged." *Id.* at 269. Absent such a direct connection, a plaintiff has no standing to bring a RICO suit. *Id.* at 268-69.

Reversing a decision of the Second Circuit, the Supreme Court returned to this issue in *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 461, 126 S.Ct. 1991, 1998 (2006) where it held that "the central question … is whether the alleged violation led directly to the plaintiff's injuries."  In *Anza,* the Court held that a manufacturer of steel mill products failed to plead the proximate cause element of a civil RICO claim when it alleged that a competitor had harmed it by repeatedly failing to pay taxes. *Anza,* 547 U.S. at 456-62. The plaintiff had asserted that, by evading sales taxes through mail and wire fraud, the defendants reduced their prices and harmed competition. *Id.* at 454, The Court concluded that the "[t]he cause of [plaintiff's] asserted harms, however, is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Id.* at 458. The Court noted that New York State, which was defrauded of its sales taxes, was a direct victim of the enterprise, whereas the plaintiffs were not "direct" victims and that it would be very difficult to determine the extent to which the defendants' decrease in prices resulted from the tax evasion as opposed to other factors.  The Court also observed that the fact that the defendants committed tax evasion did not necessarily mean that they would reduce their prices (they could have taken profits or reinvested) nor would plaintiff's alleged lost sales necessarily have resulted from the tax evasion. *Id.* at 456-62.

The reasoning of *Anza,* mandating dismissal on the complaint, applies here.  Plaintiffs are not in any meaningful way "direct" victims of any scheme to hire undocumented aliens.  At most, they contend they are indirect victims because they claim they experience lower wages and reduced bargaining power as a secondary consequence of the hiring of undocumented workers.

But, just as in *Anza,* there is no way of establishing such causation, and, indeed, the plaintiffs

wage may be a product of a myriad of factors.  Employers such as defendants have the

motivation to seek lower wages regardless, and undocumented workers who, after all, must live

and support themselves like anyone else, are motivated to seek higher wages.  Even  if

Defendants violate the law by not verifying employment eligibility it is far from a given that

lower wages to documented workers is a necessary consequence.  *See also Baker v. IBP, Inc.*,

357 F.3d 685 (7th Cir. 2004)(ruling on other grounds in case by employees challenging

undocumented hiring but noting "difficulty of establishing that unlawful hiring of aliens caused a

diminution in their wages. RICO provides treble damages for direct injuries but not remote ones.

See *Holmes v. SIPC,* 503 U.S. 258, 112 S.Ct. 1311 (1992).").

      Moreover, as in *Anza* the directly affected party with the responsibility to enforce the

laws claimed to have been broken – the United States government – is particularly well suited to

take any legal action that is necessary.  Again, the theory here would open a Pandora's Box,

where plaintiffs would be encouraged to use the RICO laws entirely out of context to designate

themselves in effect private attorney's general purporting to "enforce" any number of laws on

what at best are indirect theories of loss causation.   Otherwise put, Plaintiffs lack standing

because they are outside the "zone of interest" in enforcing the nation's immigration laws,

particularly given the absence of a Congressionally-endorsed private cause of action for claims

such as those advanced here.  *See  Anza,* 547 U.S. at 462 (Scalia, J. concurring); *Holmes,* 503

U.S. at 286-90 (Scalia, J. concurring in the judgment).[2]

      **B.**      **Failure to Satisfy Enterprise Requirement**

      Plaintiffs also fail to plead an enterprise that is both distinct from the pattern of

racketeering and from the persons conducting the affairs of the enterprise.  Under RICO, an

"enterprise" is "any individual, partnership, corporation, association, or other legal entity, and

any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. §

1961(4). The Supreme Court has defined a RICO enterprise as "a group of persons associated

together for a common purpose of engaging in a course of conduct[,]" the existence of which is

proven "by evidence of an ongoing organization, formal or informal, and by evidence that the

various associates function as a continuing unit." *United States v. Turkette,* 452 U.S. 576, 583,

101 S.Ct. 2524, 2528 (1981).   Importantly, the enterprise "must be separate from the pattern of

racketeering activity, and distinct from the person conducting the affairs of the enterprise." *First

Capital Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159, 173 (2d Cir.2004) (internal citations

omitted).

Here, Plaintiffs posit two enterprises. In Count I, they identify "EMC" as the enterprise.

In Count II, they claim the enterprise is an "association of fact" of EMC, Mahoney and non-party

American Latin.  Neither "enterprise" satisfies RICO's strictures.

Count I clearly fails to satisfy RICO.  This is a case charging three EMC entities and

Mahoney as defendants.  By stating that EMC is the enterprise, Plaintiffs are saying for all

intents and purposes that EMC is both the enterprise and the corporate entity conducting the

affairs of the enterprises through a pattern of racketeering.  But the law requires a distinction

between the enterprise and the entities or persons conducting the affairs of the enterprise through

a pattern of racketeering.  Here the distinction is obliterated.

The alternative theory in Count II is likewise deficient.  In *Baker v. IBP, Inc.*, 357 F.3d

685 (7th Cir. 2004), the Seventh Circuit rejected just such an "enterprise in fact" consisting of the

company accused of hiring undocumented aliens,  an association of Chinese workers said to

assist and to facilitate such hiring, and related individuals.  But the Court found that the various

14

entities comprising the association in fact had "divergent goals" – for example the company

presumably wanted to pay lower wages whereas the Chinese organization wanted to assist

members of its ethnic group.   In the end the court found the complaint reduced to the allegation

that the company was running itself unlawfully by hiring undocumented aliens and that there

was no suggestion whatsoever that a truly distinct entity was "infiltrated, taken over,

manipulated, disrupted, or suborned." *Id.* at 691-92.

### III.    <u>The Antitrust Counts Also Fail to State Claims</u>

Turning in an entirely new direction, the Plaintiffs assert the rights of EMC's competitors

by claiming that EMC's hiring of undocumented aliens gave it an unfair leg up in securing

contracts after competitive bidding and that somehow two former employees – as opposed to

other companies that bid – ought to recover.   This argument is advanced under the Sherman Act,

15 U.S.C. § 1 and New York's Donnelly Act, N.Y. Gen Bus. Law. § 340.  Plaintiffs fail to plead

adequately, entirely lack standing to make these claims nor do they state a conspiracy to restrain

trade.

#### A.    <u>Failure to Plead With Specificity</u>

With all due respect, the antitrust claims in the Complaint seem to constitute an effort to

throw something against the wall to see what sticks.  Despite the detailed and comprehensive

body of statutory and case law in this area, Plaintiffs do little more than allege that Defendants

had an unfair advantage in competitive bidding by hiring undocumented aliens.  No competing

companies are mentioned.  No bids are mentioned.  No companies with whom Defendants

purportedly agreed to conspire with are even mentioned.  Plaintiffs offer only this vague and

generic conclusion.

In its recent decision in *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1964 (2007), the Supreme Court squarely held that barebones pleadings like those presented here are inadequate and mandate dismissal.  As the Court commenced its opinion,

> Because § 1 of the Sherman Act 'does not prohibit [all] unreasonable restraints of trade ... but only restraints effected by a contract, combination, or conspiracy,' *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 775, 104 S.Ct. 2731 (1984), '[t]he crucial question" is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express,' *Theatre Enterprises, Inc. v. Paramount Film Distributing,* 346 U.S. 537, 540, 74 S.Ct. 257 (1954).

The Court in *Bell Atlantic* continued to cite the general rule:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, *ibid.; Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 251 (C.A.7 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)…

127 S.Ct. at 1964-65.  The Court in *Bell Atlantic* then articulated the rule for antitrust cases:

> In applying these general standards to a § 1 claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.

127 S.Ct. at 1965.  The Supreme Court also emphasized practical concerns that improperly pleaded antitrust complaints take on an "in terrorism" effect to unfairly coerce settlement as well as the concerns of the great expenses of antitrust discovery.  *Id.* at 1966-67.

Under these standards, both antitrust claims must be dismissed for sheer failure to plead with sufficient specificity.   Plaintiffs do not even attempt to satisfy the requisite standards or to

allege the requisite agreement under the Sherman Act or the Donnelly Act.    The Complaint must be dismissed for this reason alone.

> **B.**    <u>**Lack of an Agreement**</u>

Even apart from the lack of specificity in the Complaint, it is equally clear that the Plaintiffs simply do *not* allege the requisite agreement under the antitrust laws.  The Supreme Court has time and again emphasized that a complaint for conspiracy in restraint of trade under Section 1 of the Sherman Act, 15 U.S.C. § 1, requires just that, an agreement.  The law, after all, is designed to combat conspiracies or combinations in restraint of trade, and not simply bad behavior that might have an anticompetitive effect.  As noted above in *Bell Atlantic*,  127 S.Ct. at 1964, Section One of the Sherman Act "'does not prohibit [all] unreasonable restraints of trade ... but only restraints effected by a contract, combination, or conspiracy,' *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 775, 104 S.Ct. 2731 (1984)."

In *Copperweld,* the Court rejected a claimed conspiracy between a company and its subsidiary.  The Court explained that the Sherman Act requires a showing of an agreement between "separate entities. It does not reach conduct that is "wholly unilateral."  467 U.S. at 768 (citing <u>Albrecht v. Herald Co., 390 U.S. 145, 149, 88 S.Ct. 869, 871(1968)</u>).  Thus, the Court continued, "it is perfectly plain that an internal 'agreement' to implement a single, unitary firm's policies does not raise the antitrust dangers that <u>§ 1</u> was designed to police."  Thus, the Court went on, the officers of a firm, nor its divisions cannot conspire within the meaning of the act. Nor, the Court held, deciding the issue in the case can a corporation conspire with its wholly owned subsidiary.  *Id.* at 767-77.

As one court has summarized, New York law parallels federal law on these points:

> Neither the Sherman Act nor the Donnelly Act proscribe
> independent action ( *see Monsanto Co. v. Spray-Rite Service*

17

> *Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775, *reh.*
> *denied* 466 U.S. 994, 104 S.Ct. 2378, 80 L.Ed.2d 850 [Sherman
> Act]; *State v. Mobil Oil Corp.,* 38 N.Y.2d 460, 464, 381 N.Y.S.2d
> 426, 344 N.E.2d 357: "a one-sided practice ... is outside the scope
> of the Donnelly Act]"). Section 1 of the Sherman Act requires that
> there be a "contract, combination ... or conspiracy", while the
> Donnelly Act requires a "contract, agreement, arrangement or
> combination" (General Business Law § 340[1] ).

*George Miller Brick Co. v. Stark Ceramics,* 9 Misc.2d 151, 801 N.Y.S.2d 120 (Sup.Ct. N.Y. Co.

2005).[3]

Under these principles it is plain the Complaint must be dismissed.    At most, Plaintiffs

allege some sort of unilateral "agreement" within the entities comprising EMC and fail to

establish a true agreement among business entities in the same market as the antitrust provisions

were designed to combat.

**C.    <u>Lack of Standing</u>**

The antitrust claims must also be dismissed for lack of standing.    To the extent that

Defendants have achieved some sort of competitive advantage in the market place through

alleged hiring of undocumented aliens, such claims must be vindicated, if at all, by aggrieved

competitors of EMC, not former employees.

As the Second Circuit has summarized in regard to standing:

> To recover, a plaintiff must show, *inter alia,* that it suffered an
> "antitrust injury." An antitrust injury is an "injury of the type the
> antitrust laws were intended to prevent and that flows from that
> which makes defendants' acts unlawful." *Brunswick Corp. v.*
> *Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690 (1977).
> "The injury should reflect the anticompetitive effect either of the
> violation or of anticompetitive acts made possible by the violation"
> because "[t]he antitrust laws ... were enacted for 'the protection of
> *competition,* not *competitors.*' "*Id.* at 488, 489, 97 S.Ct. 690
> (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82
> S.Ct. 1502 (1962) (emphasis added));

*Paycom Billing Services v. Mastercard Int'l,* 467 F.3d 283, 290 (2d Cir. 2006).

In adherence with these principles, countless times courts have noted that employees, shareholders, officers and others affiliated with companies are usually *not* proper plaintiffs where the antitrust injury in question is suffered by the corporation as a whole and only passed along indirectly to individuals. *See, e.g., Air Courier Conference of America v. American Postal Workers Union,* 498 U.S. 517, 111 S.Ct. 913 (1991)(postal workers not within "zone of interest" to challenge allowance of private competition despite claimed injury to livelihood); *Adams v. Pan American World Airways, Inc.,* 828 F.2d 24 (D.C. Cir. 1987) (former airline employees lacked standing to assert antitrust claim against airline that allegedly drove their former employer out of business); *Curtis v. Campbell-Taggart, Inc.,* 687 F.2d 336 (10th Cir. 1982) (corporate employees injured by anticompetitive conduct did not have antitrust standing); *Jones v. Ford Motor Co.,* 599 F.2d 394, 397 (10th Cir.1979) (shareholders and employees do not have standing to sue for antitrust violations that injure a corporation); *Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1378 (7th Cir.1987) ("Merely derivative injuries sustained by employees, officers, stockholders, and creditors of an injured company do not constitute 'antitrust injury' sufficient to confer antitrust standing."); *Sharp v. United Airlines,* 967 F.2d 404, 408-09 (10th Cir. 1990) (airline employees alleging that conspiracy to restrain trade drove airline out of business lacked antitrust standing complain of antitrust injury arising out of job loss).

Here, the lack of standing of Plaintiffs is doubly evident. The Plaintiffs are former employees improperly attempting to assert an injury belonging by the very terms Plaintiffs discuss to corporate competitors. Moreover, Plaintiffs are not even the former employees of those competitors. Simply put, at most this is an internal labor-management issue not having

anything to do with the purposes of the antitrust laws in combating illegal combinations and conspiracies in restraint of trade.   Plaintiffs have no standing whatsoever to make these claims.

**IV.    The Labor Law Claims Must Also Be Dismissed**

The entirety of Plaintiffs' factual assertions in regards to Count VI under the Fair Labor Standards Act ("FSLA") 29 U.S.C. § 201 and Count VII under New York State Labor Law §§ 190,650 are as follows:  "During the time they worked for EMC, plaintiffs did not receive overtime wages or benefits.  They regularly worked over 40 hours a week. In some weeks, they were paid no wages at all because their pay checks bounced for insufficient funds."  Complaint, ¶82.   The only further gloss on these allegations is the accusation that Defendants acted "willfully and intentionally and in "reckless disregard for the wage and hour laws" ¶83 and that Plaintiff Nichols worked for EMC from October 2004 to November 2006.  ¶30.  Plaintiff Moraes worked for defendants "in 2007."  ¶31

Although the FSLA and New York Labor claims would not be subject to the heightened pleading requirements, for example, with fraud allegations, these bare, conclusory charges do not even satisfy the minimal standards under Rule 8.  As *Zhong v. August August Corp.*, 498 F.Supp.2d 625, 628 (S.D.N.Y. 2007) summarizes:

> The language of the FLSA's minimum wage and overtime compensation provisions establish the elements that should be alleged in order to survive a motion to dismiss.  First, these provisions are binding only where there existed between the plaintiff and the defendant an employee-employer relationship. *See* FLSA §§ 206(a) and 207(a)(1). A complaint should allege that such a relationship existed in order to demonstrate the plaintiff's eligibility to recover damages. Second, the FLSA's minimum and overtime wage provisions apply only to employees whose work involved some kind of interstate activity. *See id.* Third, where the plaintiff alleges violations of the FLSA's minimum and overtime wage provisions, the complaint should, at least approximately, allege the hours worked for which these wages were not received. Finally, where a plaintiff brings an FLSA claim "for and in behalf

> of himself ... and other employees similarly situated," the
> complaint should indicate who those other employees are, and
> allege facts that would entitle them to relief. FLSA § 216(b).

Plaintiffs do not satisfy these basic standards.  The Complaint contains no approximation or

identification of hours worked for which wages or overtime were not received.  The Complaint

fails to establish that the Plaintiffs in particular were engaged in interstate activity.  The

Complaint also fails to make the requisite charges of interstate commerce and annual gross sales

of $500,000.  *Edwards v. Community Enterprises, Inc.*, 251 F.Supp.2d 1089, 1100-01 (D. Conn.

2003)(citing 29 U.S.C. § 203(s)(1)(A).

The Complaint is also deficient given that Plaintiffs charge willful violations, apparently

to extend the ordinary two year limitations period to three.  29 U.S.C. § 255.  Indeed, Plaintiff

Nichols term of employment suggests that his claim in part or in full would not even fall under

the three year deadline.  Because Plaintiffs provide clearly insufficient specifics to their wholly

conclusory allegations, the claims must be dismissed on the insufficiency of the allegations as

well as failure to meet the limitations period.  *See Mason v. Am. Tobacco Co., 346 F.3d 36, 39*

*(2d Cir.2003(*"[l]egal conclusions, deductions or opinions couched as factual allegations.")*);*

*compare Damassia v. Duane Reade, Inc.,* 2005 WL 1214337 (S.D.N.Y. 2005)(summarizing

"ample factual detail" in complaint).  *Cf.  Seever v. Carrols Corp.,* 528 F.Supp.2d 159, 169

(W.D.N.Y. 2007)("plaintiffs' claims that they worked off-the-clock time for which they were not

compensated....comprised largely of nebulous recollections..."; on combined motion to dismiss

and for summary judgment).

Here Plaintiffs do not provide even a minimal factual description sufficient to put

Defendants on notice and to be able to ascertain what defenses or exemptions of which there are

many in the law would apply.

**V.     State Pendent Claims Should Be Dismissed.**

        To the extent that state law claims remain notwithstanding dismissal of federal claims,

the Court should decline to exercise jurisdiction and dismiss the state claims as well.  *See, e.g.,*

*Bhd. of Locomotive Eng'rs Div. 269 v. Long Island R.R. Co., 85 F.3d 35, 39 (2d Cir.1996)*.  The

Complaint should be dismissed in its entirety.


                                    **CONCLUSION**

        The motions to dismiss the Complaint should be granted .

Dated:          New York, New York
                July 2, 2008

                                    Respectfully submitted,


                                    _____
                                    George L. Santangelo, Esq. (GS3474)
                                    111 Broadway, Suite 1706
                                    New York, New York 10006
                                    (212) 269-4488

                                    Attorneys for Defendant
                                    Dominick Devito