UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ANDRE NICHOLS, and DANIEL                      ECF Case
MORAES,

                           Plaintiffs,         Docket No.
                                               08-CV-3306 (CM) (DCF)

     -   against -                             **DECLARATION IN
                                               OPPOSITION TO
MICHAEL T. MAHONEY, EMC CONTRACTING            DEFENDANTS'
INC., EMC NEW YORK CONTRACTING, and            MOTION TO DISMISS**
EMC of NEW YORK, INC.,

                           Defendants.
------------------------------------------------------------X

         I, Joy K. Mele, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of

perjury that the following, which I executed on August 1, 2008, is true and correct:

         1.     I am associated with the firm of O'Dwyer & Bernstien, LLP, attorneys for

plaintiffs in the above-entitled action.

         2.     I make this declaration in opposition to the motion to dismiss filed by all

defendants.

         3.     Attached as Exhibit 1 to this declaration is a true and correct copy of

plaintiffs' proposed Amended Complaint.

Dated: August 1, 2008
       New York, New York


                             _____s/ Joy K. Mele_____
                                 Joy K. Mele (JM0207)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ANDRE NICHOLS, and DANIEL
MORAES,

                    Plaintiffs,

   - against -

MICHAEL T. MAHONEY, EMC CONTRACTING
INC., EMC NEW YORK CONTRACTING, and
EMC of NEW YORK, INC.,

                    Defendants.

-------------------------------------------------------------X

ECF Case

Docket No. 08-CV-3306 (CM) (DCF)

**PROPOSED AMENDED COMPLAINT**

        Plaintiffs, appearing by their attorneys, O'Dwyer & Bernstien, LLP, as and for their Amended Complaint against defendants, allege as follows:

## I. PRELIMINARY STATEMENT

      1.    Plaintiffs Andre Nichols ("Nichols") and Daniel Moraes ("Moraes"), former employees of defendants EMC Contracting, Inc. EMC New York Contracting, and EMC of New York, Inc., are the victims of a scheme perpetrated by defendants to depress the wages paid to its employees, including plaintiffs, by knowingly hiring a workforce substantially comprised of illegal workers, in violation of Section 274 of the Immigration and Nationality Act, for the express purpose of depressing the wages of all its workers (hereafter "the Illegal Alien Hiring Scheme"). In furtherance of their illegal scheme, defendants engaged in numerous instances of mail and/or wire fraud.

      2.    Defendants' illegal scheme also restrains free competition within the construction industry by allowing defendants to have an unfair advantage over other employers who do not employ illegal workers, and forces workers authorized to work in the U.S. to unfairly compete against illegal workers for jobs at much lower wages.

1

3.      In addition, defendants regularly and routinely did not comply with federal and New York State wage and overtime laws.  Plaintiffs regularly worked more than 40 hours a week for defendants, without overtime wages.

4.      As a result of defendants' illegal and fraudulent actions, plaintiffs have incurred substantial damages.

## II. JURISDICTION, AND VENUE

5.      This Court has subject matter jurisdiction over Counts I, II, and III of this case pursuant to 18 U.S.C. § 1964(c), and 28 U.S.C. § 1331.  This Court has subject matter jurisdiction over Count IV of this case pursuant to 15 U.S.C. § 15(a), and 28 U.S.C. § 1331 and § 1337.  This Court has subject matter jurisdiction over Count V of this case pursuant to N.Y. Gen. Bus. Law § 340.  This Court has subject matter jurisdiction over Count VI of this case pursuant to 29 U.S.C. § 216, and 28 U.S.C. § 1331 and § 1337.  This Court has subject matter jurisdiction over Count VII of this case pursuant to N.Y. Labor Law § 198 and § 663.  This Court may exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events giving rise to the claims occurred in this district.  Venue is also proper in this district pursuant to 28 U.S.C. § 1391(c), as defendants EMC Contracting, Inc., EMC New York Contracting, and/or EMC of New York, Inc. are corporations subject to the personal jurisdiction of this district.  Venue is also proper in this district pursuant to 18 U.S.C. § 1965 and 15 U.S.C. § 22, as defendants EMC Contracting, Inc., EMC New York Contracting, EMC of New York, Inc., and Michael T. Mahoney reside, are found in, and/or transact their business affairs in the Southern District of New York.

III. PARTIES

7.      Plaintiff Andre Nichols is, and at all relevant times, has been a resident of New York and authorized to be employed in the U.S.  Plaintiff Nichols agrees and consents to be a plaintiff in this lawsuit for claims brought under the Fair Labor Standards Act.  A written consent executed by plaintiff is attached hereto.

8.      Plaintiff Daniel Moraes is, and at all relevant times, has been authorized to be employed in the U.S.  Plaintiff Moraes agrees and consents to be a plaintiff in this lawsuit for claims brought under the Fair Labor Standards Act.  A written consent executed by plaintiff is attached hereto.

9.      Upon information and belief, defendant Michael T. Mahoney ("Mahoney") is, and at all relevant times, has been a resident of New York, with a principal place of residence located at 4 Brown Drive, Pearl River, NY, in the County of Rockland and State of New York.

10.     Upon information and belief, defendant EMC Contracting, Inc. is a corporation organized under the laws of the State of New York, with a principal place of business located at 36 Mill Plain Road, Suite 301, Danbury, CT, 06811.

11.     Upon information and belief, defendant EMC New York Contracting is an unincorporated business controlled by defendant Mahoney with a principal place of business located at 74 Academy Street, Belleville, NJ 07109.

12.     Upon information and belief, defendant EMC of New York, Inc. is a corporation organized under the laws of the State of New York, with a principal place of business located at 74 Academy Street, Belleville, NJ 07109.

13.     Upon information and belief, defendants EMC Contracting, Inc.,

EMC New York Contracting, and EMC of New York, Inc. (hereinafter collectively referred to as

"EMC") are joint or single employers, or alternatively, alter egos. Upon information and belief,

defendants EMC, in addition to maintaining offices at 36 Mill Plain Road, Suite 301, Danbury,

CT, and 74 Academy Street, Belleville, NJ, also maintain or maintained offices at 29 Forest

Ave., Pearl River, NY, 22 South Main Street, Pearl River, NY, 225 Millwood Road, Chappaqua,

NY, and a post office box at P.O. Box 83, Bethel, CT 06801.

## IV. FACTS

A. The Illegal Alien Hiring Scheme

14.    The construction industry requires the work of skilled construction

workers and carpenters who are involved in nearly every phase of building.

15.    Carpentry work includes pouring the concrete to create slab floors,

framing and finishing interior and exterior walls, applying drywall, and installing molding and

millwork. From laying the foundation to trimming the doors and windows, carpenters create the

major structural elements of today's modern buildings and infrastructure. The work is often

dangerous and requires specialized skills.

16.    Some contractors respond to the competitive pressures of the industry by

exploiting the ready and available population of workers not authorized to work in the U.S.

17.    According to a major comprehensive research report issued by the Pew

Hispanic Center, there were approximately 7.2 million unauthorized migrants employed in the

U.S. in March, 2005. Jeffrey S. Passel, Ph.D., The Size and Characteristics of the Unauthorized

Migrant Population in the U.S., Pew Hispanic Center, March 7, 2006. The report found that as

much as 14% of all workers in the construction industry are unauthorized migrants. Id. The

report defined an unauthorized migrant as "a person who resides in the United States but who is

not a U.S. citizen, has not been admitted for permanent residence, and is not in a set of specific authorized temporary statuses permitting longer-term residence and work." Id., at 1. The majority of the unauthorized population in the U.S. come from Mexico and Latin America, with about 56% coming from Mexico, and 22% coming from Latin America, primarily from Central America. Id. at 4. Within the construction industry, unauthorized workers comprise 36% of all insulation workers, 29% of all roofers, 28 % of all drywall installers, ceiling tile installers, and tapers, 27% of helpers in construction trades, and 25% of construction laborers. Id. at 12. Unauthorized workers are three times more likely to be working in the construction industry than those native born. Id. at 13. About 1 in 5 unauthorized workers were in the construction industry in March, 2005 as compared with 7%-8% of native workers. Id.

18.    Upon information and belief, since 2002, defendants EMC have been in the construction business in New York City.

19.    Upon information and belief, defendant Mahoney is the President of EMC Contracting, Inc., EMC New York Contracting, and EMC of New York, Inc. and as such, is involved in every aspect of the business of EMC, including, but not limited to, the hiring of its workers.

20.    Upon information and belief, defendants EMC employ or have employed dozens of hourly paid workers in its operations in New York City.

21.    Upon information and belief, defendants EMC have employed and continue to employ workers that they knew or had reason to know were not authorized to work in the U.S.

22.     Upon information and belief, the majority of the EMC workforce was comprised of illegal workers, with substantial numbers from Mexico, Latin America, and Ireland.

23.     Upon information and belief, the majority of EMC's workers from Mexico and Latin American could not speak, read, or write English.

24.     Upon information and belief, many of the supervisors and foreman on EMC job sites were illegal workers from Ireland.

25.     Upon information and belief, EMC's practice of hiring large numbers of illegal workers implicitly gave prospective illegal workers assurance that they would be hired by EMC despite their illegal status.  Upon information and belief, EMC's illegal workers knew that EMC hired illegal workers and that they would not be asked for proof of employment eligibility or "legal papers."

26.     Upon information and belief, in 2007, defendants EMC began a business relationship with American Latin Services Enterprises, Corp. ("American Latin").

27.     Upon information and belief, American Latin provides EMC a pool of illegal workers to work on EMC job sites.  These workers take direction from EMC's foremen and supervisors, but are paid by American Latin.  Upon information and belief, American Latin receives a fee for each worker provided to EMC.

28.     Upon information and belief, defendants EMC were and continues to be employers and/or joint employers with American Latin.

29.     Upon information and belief, American Latin knew or had reason to know that the workers they provided to EMC were not authorized to work in the United States.

30.    Upon information and belief, defendants EMC knew or had reason to know that the workers American Latin provided to EMC were not authorized to work in the U.S.

31.    Upon information and belief, defendants EMC, in addition to employing the illegal workers provided by American Latin, continued to directly hire illegal workers. The majority of the illegal workers EMC hired directly were Irish.

32.    Upon information and belief, defendants EMC routinely fail to ask employees for proof of employment eligibility when hired, because they know that the worker is not authorized to work in the U.S.

33.    The Immigration Reform and Control Act, 8 U.S.C. § 1324 *et seq.*, requires employers to verify, under penalty of perjury, that they have examined certain documents provided by each employee which establishes the employee's authorization for employment in the U.S.

34.    The I-9 form is the document each employer must complete to verify employment eligibility for each employee.

35.    The employee must complete and sign Section 1 of the I-9 form at the time of hire. In completing Section 1, the employee must attest that he is eligible to be employed in the U.S.

36.    The employer must complete and sign Section 2 of the I-9 form. The employer is required to examine the original documents the employee presents establishing identity and employment eligibility within 3 business days of the date employment begins.

37.    By signing Section 2, the employer is attesting under penalty of perjury that he has examined the necessary documents and that they appear genuine and relate to the employee named on the I-9 form.

38.    Upon information and belief, defendants and American Latin knowingly engaged in a scheme in which they knowingly and recklessly intentionally failed to comply with their I-9 obligations.  EMC and American Latin failed to ask employees to present proof of identity and employment eligibility because they knew their workers were illegal aliens unauthorized to work in the U.S.

39.    Upon information and belief, it was not uncommon for employees to receive checks from American Latin with names and addresses that did not correspond to the employee's actual name and address.  Upon information and belief, American Latin provided false names and addresses on their paychecks precisely because they knew the workers they provided to EMC were unauthorized to work in the U.S.

40.    Upon information and belief, defendants did not ask employees to sign Form W-4, the Employee's Withholding Allowance Certificate, because they knew that workers were not authorized to work in the U.S.

41.    Upon information and belief, defendants did not withhold necessary taxes and deductions from the wages paid to their employees.

42.    Upon information and belief, on several occasions EMC shut down job sites, because they were in fear of raids by the Immigration and Naturalization Services ("INS").

43.    Upon information and belief, on several occasions EMC's illegal workers refused to come to work out of fear of raids by the INS, thereby shutting down the job site.

44.    Upon information and belief, from time to time defendants held meetings in which they told their workers they had an attorney who could get them legal work papers if they paid the attorney several thousand dollars.

45.    Defendants EMC and Mahoney hired the illegal workers with the express purpose to drive down the wages of all its workers, thereby reducing their labor costs allowing them to make considerable profits.

46.    Plaintiff Nichols worked for defendants EMC from on or about September 23, 2004 to on or about August 18, 2006.

47.    Plaintiff Moraes worked for defendants EMC in 2007.

48.    Upon information and belief, plaintiffs were employees of defendants EMC, and not independent contractors.

49.    Upon information and belief, plaintiffs were paid wages which were significantly lower than the market rate.

50.    In addition, plaintiffs were not paid any overtime wages for hours worked over 40 hours per week.

51.    During the time he worked for EMC, plaintiff Moraes worked on average approximately 50 hours a week.  He was never paid overtime.

52.    During the time he worked for EMC, plaintiff Nichols worked on average over 65 hours a week.  He was never paid overtime.

53.    During the time he worked for EMC, plaintiff Nichols was paid in cash until about May or June of 2006, when he was paid by company check.

54.    During the time he worked for EMC, plaintiff Moraes was paid either in cash or by check.

55.    When EMC started paying their workers by check, the checks would routinely bounce for insufficient funds.

56.    Many of the illegal workers would cash their paychecks at check cashing stores.  Because EMC checks bounced so often, the check cashing stores would refuse to cash EMC checks.

57.    As intended, defendant EMC's employment of large numbers of illegal workers substantially increased the supply of workers from which EMC made up their hourly workforce.  The unlawful expansion of the labor pool had the direct and proximate result of enabling EMC to depress the wages of all its hourly workers, including plaintiffs and others authorized to work in the United States.

58.    The wages of EMC's workforce, including plaintiffs' wages, were significantly lower than they would be if EMC and Mahoney did not engage in the Illegal Alien Hiring Scheme.

59.    An intended effect of EMC's employment of illegal workers was to deprive all their workers of any individual or collective bargaining power.  Because EMC and Mahoney knew that many of their workers were not authorized to work in the U.S., they knew that their workers would not complain about wages, lack of overtime pay and benefits, and dangerous working conditions out of fear of losing their jobs.

60.    Defendants used the mail and/or wires to further the Illegal Alien Hiring Scheme.

61.    Upon information and belief, defendants made repeated use of the interstate wires to transfer and move monies and/or documents in furtherance of the Illegal Alien Hiring Scheme.

62.     Upon information and belief, defendants paid their workforce from accounts in which there were insufficient funds to pay their workers, thereby causing paychecks to bounce.

B.     The RICO Violations

63.     The federal RICO pattern of racketeering activity engaged by EMC and Mahoney consists of their ongoing violation of Sections 274(a)(1)(A)(iii) and 274(a)(3)(A) of the Immigration and Nationality Act.  18 U.S.C. § 1961(1)(F).

64.     Section 274(a)(1)(A)(iii) provides that "Any person who knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation . . . shall be fined under title 18, United States Code, imprisoned not more than 5 years, or both." 8 U.S.C. § 1324(a)(1)(A)(iii).

65.     Section 274(a)(3) provides that "Any person who, during any 12-month period, knowingly hires for employment at least 10 individuals with actual knowledge that the individuals are aliens described in subparagraph (B) shall be fined under title 18, United States Code, or imprisoned for not more than 5 years, or both." 8 U.S.C. § 1324(a)(3).

66.     Upon information and belief, defendants EMC and Mahoney have knowingly hired 10 or more individuals each calendar year since 2004 with actual knowledge that the workers were not authorized to work in the U.S., and had been brought into the U.S. in violation of § 1324.

67.     Upon information and belief, it was common knowledge within EMC that their workers were not authorized to work in the U.S.  In fact, EMC's own supervisors and/or

foremen were illegal aliens. Many of EMC's workers sought out employment with EMC, because they knew that EMC hired illegal workers, and therefore they would not be required to show proof of employment eligibility.

68.    In an effort to shield their illegal workers from detection, EMC and American Latin intentionally did not complete I-9 forms or asked their employees to complete W-4 forms.

69.    EMC and American Latin also did not take taxes or deductions from the workers' wages, and paid their workers in cash. When they started to pay their workers by check, no paystub was included, and the checks merely consisted of a company check made out to the employee.

70.    In a further effort to conceal, shield, and/or harbor their illegal workers, EMC would shut down the jobsite if they thought government authorities would be conducting a raid.

71.    On several occasions, the jobsite was shut down, not at the direction of EMC, but because the illegal workers refused to come to work out of fear of a raid by the authorities. Because the majority of EMC's workforce were illegal workers, no work was performed on those days.

72.    Defendants' actual knowledge that their workers were illegal is evidenced by the many affirmative steps EMC took to conceal, shield, and/or harbor their illegal workforce from detection by the authorities.

73.    In addition, EMC affirmatively took steps to hide their illegal workers from detection precisely because they knew their workers had been brought into the U.S. in violation of § 1324.

74.    At a minimum, given the highly publicized and comprehensive measures undertaken by the federal government, especially since 2001, to safeguard our borders and prevent unauthorized entry into the U.S., and to criminal employers who hire illegal workers, defendants knew or should have known that the illegal workers they hired were brought into the U.S. in violation of § 1324.

75.    Defendants' "open-ended" pattern of racketeering activity amounts to and/or poses a threat of continued long-term future criminal conduct.

76.    Defendants' knowing employment of illegal workers, and the affirmative acts they did to shield, conceal, and/or harbor their illegal workers are part of defendants' regular way of doing business.

77.    Defendants' racketeering activity is neither isolated nor sporadic, and instead is ongoing and will continue into the future.

C.    The Enterprises

78.    Defendant Mahoney has engaged in an open and ongoing pattern of racketeering activity, in violation of Section 274 of the Immigration and Nationality Act, 8 U.S.C. § 1324(a), and in violation of 18 U.S.C. § 1341, through his conduct and participation in defendants EMC, the enterprise.

79.    Defendant Mahoney, as President of EMC Contracting, Inc., EMC New York Contracting, and EMC of New York, Inc., is personally involved in and directs all aspects of the business of EMC, including the operation and management of the enterprise itself, including the hiring and retention of workers.

80.    Defendant Mahoney knowingly hires a workforce largely comprised of illegal workers.  Mahoney then directly or directs others within EMC to forego the I-9 and

W-4 requirements mandated by law.  Mahoney retains the illegal workers as part of his

workforce despite knowing they are not eligible to work in the U.S. and that they were brought

into the U.S. in violation of law.

81.     Defendant Mahoney, a natural person and owner and officer of defendants

EMC, is distinct from EMC, the legal entities themselves.

82.     Defendant Mahoney's active participation was and continues to be a

significant factor in the success of the Illegal Alien Hiring Scheme.

83.     Mahoney and EMC share the common purpose of obtaining illegal

workers for employment by EMC.

84.     The enterprise affects interstate commerce in that the monies, supplies,

equipment, and the illegal workers employed by defendants EMC travel in interstate commerce.

85.     Defendant Mahoney accepted and retained the benefits of the acts of

racketeering activity, thereby ratifying the conduct of EMC employees who may have assisted

him in committing the acts of racketeering activity.

86.     Defendants EMC and Mahoney have engaged in an open and ongoing

pattern of racketeering activity, in violation of Section 274 of the Immigration and Nationality

Act, 8 U.S.C. § 1324(a), and in violation of 18 U.S.C. § 1341, through their participation in an

association-in-fact enterprise with American Latin, who, upon information and belief, supplied

and continues to provide EMC with illegal workers.

87.     Defendants EMC's and Mahoney's active participation in the operation

and management of the enterprise was a significant factor in the success of the Illegal Alien

Hiring Scheme.

88.    Upon information and belief, defendants EMC and Mahoney directed American Latin to obtain workers for EMC job sites.  EMC and Mahoney knew or had reason to know that the workers American Latin provided them were not authorized to work in the U.S.

89.    Upon information and belief, the workers provided by American Latin, while taking direction from EMC foreman and supervisors, were paid by American Latin.  In some instances, workers who previously were paid by EMC were, without their consent, then paid by American Latin but at further reduced wages.  Upon information and belief,

90.    Upon information and belief, EMC were and continue to be employers and/or joint employers with American Latin.

91.    American Latin is a separate legal entity under separate ownership from defendants EMC and Mahoney.

92.    EMC, Mahoney, and American Latin share the common purpose of obtaining illegal workers for employment by EMC.

93.    Upon information and belief, American Latin reaps financial benefits for each illegal worker they provide to EMC.

94.    By obtaining illegal workers, EMC and Mahoney are able to reduce their labor costs by depressing the wages of all their workers, thereby reaping a large economic benefit for themselves.

95.    The enterprise affect interstate commerce in that the monies, supplies, equipment, and the illegal workers employed by defendants EMC and provided by American Latin travel in interstate commerce.

96.    EMC and Mahoney accepted and ratified the benefits of the acts of

racketeering activities, thereby ratifying the conduct of the members of the enterprise, including American Latin, who assisted them in committing the acts of racketeering activity.

D.     Defendants' Anti-Trust Violations

97.     Defendants EMC and Mahoney are in the carpentry business in the New York metropolitan area.

98.     Defendants enter bids to developers and/or general contractors to provide carpentry work on building projects.  Developers or general contractors receive multiple bids from different companies to provide services.  Jobs are typically awarded to the lowest qualified bidder.  Companies that keep costs low have a better chance of being awarded construction jobs.

99.     The relevant service market affected by defendants' illegal actions is the very specialized area of carpentry work in the construction industry.  Carpentry work includes pouring the concrete to create slab floors, framing and finishing interior and exterior walls, applying drywall, and installing molding and millwork.  From laying the foundation to trimming the doors and windows, carpenters create the major structural elements of today's modern buildings and infrastructure. The work is often dangerous and requires specialized skills.

100.     By participating in the Illegal Alien Hiring Scheme (explained in detail above), defendants Mahoney, EMC Contracting, Inc., EMC New York Contracting, and EMC of New York, Inc. have willingly conspired with American Latin to depress the wages of all its hourly workers in order to underbid competitors for projects, and thereby make substantial profits.

101.     Defendants have directed American Latin to provide them with a pool of illegal workers.  American Latin provides the workers, but the workers take direction from EMC supervisors and foremen.

102.    Defendants' employment of illegal workers harms competition in two ways. First, by employing a workforce of illegal workers, defendants are able to pay their workers lower wages, which keeps their overall costs low thereby allowing them to unfairly underbid their competitors for construction projects for which they are awarded.   Second, by employing illegal workers, defendants illegally inflate the labor pool of available workers thereby allowing employers to hire their workers not based on skill but on acceptance of lower wages. This in turn creates a workforce of low paid unskilled workers performing work requiring a high level of skill.  Defendants' employment of illegal workers also discourages efforts to advocate for increase wages, overtime pay, and benefits, thereby further restraining competition.

103.    Defendants' illegal conduct has a substantial effect on interstate commerce.  Upon information and belief, defendants submit bids to developers and/or general contractors whose principal places of business are within and outside of the New York metropolitan area; obtain financing from financial institutions based in different cities in different states; enter into contracts with suppliers and vendors from within and outside the New York metropolitan area; and are involved in transactions in interstate commerce.  Upon information and belief, defendants hire workers who live within and outside the New York metropolitan area.

104.    Defendants' unlawful actions have unreasonably restrained trade in the market for carpentry work in the construction industry in the New York metropolitan area.

E.    Defendants' Violations of Wage and Hour Laws

105.    Defendants' employment and hiring of illegal workers also allowed them

to regularly and routinely violate federal and New York State hour and wage laws by not paying their workers, including plaintiffs, overtime pay for hours worked beyond 40 hours a week.

106.    During the time they worked for EMC, plaintiffs did not receive overtime wages or benefits.  They regularly worked over 40 hours a week.  Plaintiff Nichols on average worked over 65 hours a week, and was never paid overtime wages.  Plaintiff Moraes worked approximately 50 hours a week, and was never paid overtime wages.  In some weeks, they were paid no wages at all because their pay checks bounced for insufficient funds.

107.    Defendants willfully and intentionally failed to pay plaintiffs their lawful wages.

108.    Defendants knew and/or showed reckless disregard for the wage and hour laws to which they were obligated to follow.

F.    Plaintiffs' Injuries

109.    Defendants' RICO violations are the direct and proximate cause of the depression of plaintiffs' wages below the market wages for comparable work if the labor market was comprised solely of workers authorized to work in the U.S.

110.    Plaintiffs were the intended victims of defendants' racketeering enterprises, and as such, their injuries were reasonably foreseeable.

111.    Defendants' Illegal Alien Hiring Scheme negatively affects competition among workers, such as plaintiffs, who are authorized to work in the United States.

112.    Defendant's willful and intentional disregard of the federal and state wage and hour laws was the foreseeable and proximate cause of plaintiffs' lost wages, including overtime pay.

COUNT I

VIOLATIONS OF FEDERAL RICO, 18 U.S.C. § 1962(c)

113.    Plaintiffs reallege and incorporate by reference herein the allegations set forth in paragraphs 1 through 112 as if fully restated hereinafter.

114.    At all times relevant to this action, defendant Mahoney was a "person" as defined in 18 U.S.C. § 1961(3).

115.    Defendants EMC constitute the enterprise as defined in18 U.S.C. § 1961(4).  The enterprise had and continues to have an ongoing existence, structure, and hierarchy.

116.    At all times relevant to this action, Mahoney's violations of the Immigration and Nationality Act, as detailed in this Complaint, constitute a "pattern of racketeering activity" under 18 U.S.C. § 1961(5).

117.    Defendant Mahoney's violations of the Immigration and Nationality Act has been ongoing since 2004.

118.    Defendant Mahoney has been and is presently violating 18 U.S.C. § 1962(c) of RICO, which provides that it "shall be unlawful for any person . . . associated with any enterprise engaged in, or the activities of which affect, interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . "

119.    By reason of defendant's RICO violations, plaintiffs have been injured in their property.  Plaintiffs were paid depressed wages as a direct result of defendant's Illegal Alien Hiring Scheme.  Plaintiffs were the intended and direct victim of defendant's RICO

schemes and their injuries of depressed wages were intended and foreseeable.  As a direct result

of the schemes, defendant sustained considerable profits.

COUNT II

VIOLATIONS OF FEDERAL RICO, 18 U.S.C. § 1962(c)

120.    Plaintiffs reallege and incorporate by reference herein the allegations set

forth in paragraphs 1 through 119 as if fully restated hereinafter.

121.    This claim is asserted against all defendants.  At all times relevant to this

action, defendants EMC and Mahoney were all "persons" as defined in 18 U.S.C. § 1961(3).

122.    At all times relevant to this action, EMC and Mahoney, with the aid of

American Latin, engaged in illegal and fraudulent schemes to depress the wages of their

workforce, thereby making considerable profits.

123.    Mahoney, EMC, and American Latin constitute an "association in fact"

enterprise under 18 U.S.C. § 1961(4).

124.    The members of the enterprise had defined roles, and the enterprise as a

whole had an ongoing existence, structure, and hierarchy.

125.    Defendants Mahoney's and EMC's violations of the Immigration and

Nationality Act, as detailed in this Complaint, constitute a "pattern of racketeering activity"

under 18 U.S.C. § 1961(5).

126.    Defendant Mahoney's and EMC's violations of the Immigration and

Nationality Act has been ongoing since 2004.

127.    Defendants Mahoney and EMC have been and are presently violating 18

U.S.C. § 1962(c) of RICO, which provides that it "shall be unlawful for any person . . .

associated with any enterprise engaged in, or the activities of which affect, interstate . . .

20

commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's

affairs through a pattern of racketeering activity . . . "

128.    By reason of defendants' RICO violations, plaintiffs were paid depressed

wages as a direct result of defendants' Illegal Alien Hiring Scheme.  Plaintiffs were the intended

and direct victim of defendants' RICO schemes and their injuries of depressed wages were

intended and foreseeable.  As a direct result of the schemes, defendants sustained considerable

profits.

COUNT III

RICO CONSPIRACY CLAIM, 18 U.S.C. § 1962(d)

129.    Plaintiffs reallege and incorporate by reference herein the allegations set

forth in paragraphs 1 through 128 as if fully restated hereinafter.

130.    Upon information and belief, since 2004 and continuing to the present,

each of the defendants unlawfully and willfully combined, conspired, confederated, and agreed

between and among each other and with American Latin to violate 18 U.S.C. § 1962(c), by

conducting and participating, directly, and indirectly, in the affairs of the enterprises.

Defendants each aided and abetted the commission of each violation of the Immigration and

Nationality Act, as alleged above.

131.    Each defendant agreed to participate in the conspiracy as evidenced by

their active participation in the Illegal Alien Hiring Scheme.

132.    By reason of defendants' participation in the RICO conspiracy, plaintiffs

were paid depressed wages as a direct result of defendants' Illegal Alien Hiring Scheme.

Plaintiffs were the intended and direct victim of defendants' RICO schemes and their injuries of

21

depressed wages were intended and foreseeable.  As a direct result of the schemes, defendants

sustained considerable profits.

COUNT IV

VIOLATIONS OF THE SHERMAN ACT, 15 U.S.C. § 1

133.    Plaintiffs realleged and incorporate by reference herein the allegations set

forth in paragraph 1 through 132 as if fully restated hereinafter.

134.    Upon information and belief, since 2004 and continuing to the present, all

defendants have engaged in an unlawful contract, combination, and/or conspiracy with American

Latin that unreasonably restrains interstate trade and/or commerce in violation of 15 U.S.C. § 1,

by engaging in the Illegal Alien Hiring Scheme.

135.    Defendants have conspired with American Latin to employ a workforce of

illegal workers, thereby enabling defendants to pay their workers lower wages, which keeps their

overall costs low thus allowing them to unfairly underbid their competitors for construction

projects for which they are awarded.

136.    By paying their workers lower wages, defendants have an unfair

advantage over competitors who do not employ illegal workers, and therefore pay their workers

the market rate.  If all competitors in the carpentry market competed on an even playing field,

developers and general contractors seeking carpentry work could award contracts based on the

overall quality of the work and cost effectiveness.  Companies would have to achieve lower costs

to compete through legal means.

137.    Additionally, defendants' illegal actions unreasonably restrain trade and

adversely affect interstate commerce in the carpentry market by limiting and restricting

plaintiffs' ability to pursue their trade and forcing them to accept wages far below the market

22

rate.  Defendants' actions prohibit plaintiffs' ability to compete with other authorized workers in a market free of the presence of illegal workers who bring down the wages for all workers.

138.    Defendants illegally and artificially inflate the labor pool of available workers thereby allowing employers to hire their workers not based on skill but on acceptance of lower wages, thus creating a workforce of low paid unskilled workers performing specialized work.  Defendants' employment of illegal workers also discourages efforts to advocate for increase wages, overtime pay, and benefits, thereby further restraining competition.

139.    The actions between and amongst the defendants, and in agreement with American Latin, were committed with the intent and purpose to achieve the aforesaid anti-competitive results with the goal of substantial increased profits for defendants.

140.    Defendants' unlawful conduct has a substantial effect on interstate commerce.

141.    As a direct and foreseeable result of defendants' unlawful conduct, plaintiffs have suffered damage and injury to their property.  Defendants' unlawful conduct improperly inflated the labor pool of workers available to provide carpentry services in the relevant geographic market.  Defendants' unlawful conduct unreasonably restrained trade by limiting and restricting plaintiffs' ability to compete for work.  Plaintiffs' injuries are the type that the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.

## COUNT V

VIOLATIONS OF NEW YORK'S DONNELLY ACT, General Business Law § 340 *et seq.*

142.    Plaintiffs reallege and incorporate by reference herein the allegations set forth in paragraphs 1 through 141 as if fully restated hereinafter.

143.    Through the conduct alleged herein, defendants have violated N.Y. Gen. Bus. Law § 340 *et seq.*, which declares illegal and void "Every contract, agreement, arrangement or combination whereby . . . Competition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state is or may be restrained."

144.    As a direct and foreseeable result of defendants' unlawful conduct, plaintiffs have suffered damage and injury to their property. Defendants' unlawful conduct improperly inflated the labor pool of workers available to provide carpentry services in the relevant geographic market. Defendants' unlawful conduct unreasonably restrained trade by limiting and restricting plaintiffs' ability to compete for work. Plaintiffs' injuries are the type that the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.

## COUNT VI

## VIOLATIONS OF FLSA, 29 U.S.C. § 201 *et seq.*

145.    Plaintiffs reallege and incorporate by reference herein the allegations set forth in paragraphs 1 through 144 as if fully restated hereinafter.

146.    Defendants failed to pay overtime wages to plaintiffs in violation of the Fair Labor Standards Act ("FLSA") and its implementing regulations.

147.    For those weeks in which plaintiffs' paychecks bounced for insufficient funds, defendants failed to pay plaintiffs the minimum wage in violation of FLSA and its implementing regulations.

148.    Defendants' violations of FLSA were willful and intentional.

149.    By reason of defendants' violations, plaintiffs suffered lost wages and interest thereon.

## COUNT VII

### VIOLATIONS OF NEW YORK STATE LABOR LAW

150.    Plainitffs reallege and incorporate by reference herein the allegations set forth in paragraphs 1 through 149 as if fully restated hereinafter.

151.    Defendants failure to pay plaintiffs wages, including overtime pay is in violation of New York State Labor Law §§ 190 *et seq.*, and 650 *et seq.*, and its implementing regulations.

152.    Defendants' violations of New York State's wage and hour laws and regulations were willful and intentional.

153.    By reason of defendants' violations, plaintiffs suffered lost wages and interest thereon.

V.    PRAYER FOR RELIEF

Plaintiffs demand judgment and other relief, as follows:

A.    As to Counts I, II, and III:

    i.    Judgment in an amount equal to three times the damage sustained by plaintiffs, pursuant to 18 U.S.C. § 1964(c); and

    ii.    Costs and reasonable attorney's fees pursuant to 18 U.S.C. § 1964;

B.    As to Counts IV and V:

    i.    Judgment in an amount equal to three times the damages sustained by plaintiffs, pursuant to 15 U.S.C. § 15 and N.Y. Gen. Bus. Law § 340; and

      ii.     Costs, reasonable attorney's fees, and interest pursuant to 15

              U.S.C. § 15 and N.Y. Gen. Bus. Law § 340;

C.    As to Counts VI and VII:

      i.      Awarding plaintiffs compensatory damages, liquidated damages,

              and prejudgment interest, pursuant 29 U.S.C. § 216 and N.Y.

              Labor Law § 198; and

      ii.     Costs, reasonable attorney's fees, and interest pursuant to 29

              U.S.C. § 216 and N.Y. Labor Law § 198; and

D.    For any other relief the Court deems just and proper.

Dated: August 1, 2008
      New York, New York

                                Respectfully submitted,

                                O'DWYER & BERNSTIEN, LLP

                By:      ___s/ Gary Silverman_____
                                Gary Silverman (GS9287)
                                Joy K. Mele (GS0207)
                                Attorneys for Plaintiffs
                                52 Duane Street, 5th Floor
                                New York, NY  10007
                                (212) 571-7100